UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

DOMENICK VALLEJO,
               Plaintiff,

      v.                                      Case No. 3:13cv250 (SRU)

UCONN MANAGED HEALTH CARE, et al.,
               Defendants.

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Domenick Vallejo, currently incarcerated at Osborn Correctional Institution

("Osborn"), commenced this civil rights action *pro se* pursuant to 28 U.S.C. § 1915 against the

University of Connecticut Managed Health Care, Drs. Mark Buchanan, Omprakash Pillai, Syed

Johar Naqvi, Kevin McCrystal, Health Services Administrator Raquel Lightner and Nurses

Yvonne Francis, Joannie, Candelano, Tawanna Furtick and Dion.  On May 16, 2013, the court

dismissed the claims against all defendants except Dr. Pillai and Nurses Joannie and Dion.   The

court concluded that the Eighth Amendment claims of deliberate indifference to medical needs

as well as any state law claims against defendants Pillai, Joannie and Dion would proceed.

Defendants Pillai, Joannie and Dion have moved for summary judgment.  For the reasons that

follow, the defendants' motion is granted.

**I.**      **Standard of Review**

Summary judgment is appropriate when the record demonstrates that "there is no genuine

dispute as to any material fact to be tried and the movant is entitled to judgment as a matter of

law."  Rule 56(a), Fed. R. Civ. P.; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256

(1986) (plaintiff must present affirmative evidence in order to defeat a properly supported

motion for summary judgment).  The moving party may satisfy this burden by demonstrating the

lack of evidence to support an essential element or elements of the nonmoving party's claim with

respect to which the non-moving party has the burden of proof at trial.  *See PepsiCo, Inc. v.*

*Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

       If the issue to be resolved is both genuine and related to a material fact, summary

judgment is inappropriate.  An issue of fact is "material" if it "might affect the outcome of the

suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for

the nonmoving party" based on it.  *Anderson*, 477 U.S. at 248. "Unsupported allegations do not

create a material issue of fact."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

       When reviewing a motion for summary judgment, the court must "assess the record in the

light most favorable to the non-movant and . . . draw all reasonable inferences in [the non-

movant's] favor." *Id.*  (internal quotation marks and citation omitted).  The court may not

weigh the evidence, however, even if the court believes such evidence is implausible.  *See*

*Anderson*, 447 U.S. at 249.

       When a motion for summary judgment is supported by documentary evidence and sworn

affidavits, however, the nonmoving party must do more than vaguely assert the existence of

some unspecified disputed material facts or present mere speculation or conjecture.  *See Western*

*World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (citations omitted).  The mere

existence of a scintilla of evidence that supports the nonmoving party's position is insufficient.

*See Anderson*, 447 U.S. at 249-50 (summary judgment may be granted if evidence submitted by

non-moving party is "merely colorable" or is not "significantly probative").  Instead, evidence

must exist on which the jury could reasonably find for the non-moving party.  *See Dawson v.*

2

*County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004).  If there is any evidence in the record

from which a reasonable factual inference could be drawn in favor of the opposing party on the

issue on which summary judgment is sought, however, summary judgment is improper.  *See*

*Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

Where one party is proceeding *pro se*, the court construes the *pro se* party's papers and

pleadings "liberally and interpret[s] them" to assert the most viable arguments suggested therein.

*McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (citation omitted).  Despite this liberal

interpretation, however, an unsupported assertion or allegation in a pleading or memorandum

cannot overcome a properly supported motion for summary judgment.  *See Carey v. Crescenzi*,

923 F.2d 18, 21 (2d Cir. 1991) ("bald assertion, completely unsupported by evidence" did not

meet party's burden of demonstrating issues of material fact were in dispute and insufficient to

defeat motion for summary judgment) (citations omitted).

## II.    Facts[1]

In early December 2011, at MacDougall-Walker Correctional Institution in Suffield,

Connecticut (MacDougall-Walker), the plaintiff complained about pain in his neck and right

shoulder as well as an inability to move his right shoulder.  On December 7, 2011, an orthopedist

examined the plaintiff and noted that an x-ray showed a deformity of the right proximal

humerus.  The orthopedist recommended that the plaintiff under go an MRI of his right shoulder

and cervical spine as well as an Electromyogram and Nerve Conduction Studies of his right arm

---

[1]  The facts are taken from defendants' Local Rule 56(a)1 Statement [Doc. No. 19-2] and the exhibits and affidavit attached to that Statement [Docs. Nos. 19-3 and Doc. No. 21] and plaintiff's Local Rule 56(a)2 Statement  and Declaration [Doc. No. 24].

and shoulder.[2]  After undergoing these tests, the orthopedist examined the plaintiff again on

March 7, 2012 and determined that the plaintiff should be seen by a neurosurgeon because the

tests showed damage or disturbance to the nerve function at the C-5 level of his neck.   On May

30, 2012, the Utilization Review Committee ("URC") approved the request that the plaintiff be

seen by a neurologist at University of Connecticut Health Center.

On May 26, 2012, a nurse examined the plaintiff in response to his complaints of pain

and swelling in his lower left leg.  The plaintiff indicated that the pain in his left leg was

constant, but he could move the leg.  A nurse notified Dr. Carson Wright, the on-call physician,

who issued orders that the plaintiff be given a shot of Toradol to relieve his pain, that he be

admitted to the medical infirmary for observation over night and that he be seen by a physician

the next morning.  Approximately five hours after receiving the injection of Toradol, the plaintiff

reported to a nurse that the pain was not as severe.  On May 27, 2012, Dr. Johar Naqvi

prescribed Aspirin to be taken for one month.   On May 31, 2012, the plaintiff underwent an x-

ray of his lower left leg pursuant to a referral by Dr. Naqvi.  The x-ray revealed no erosive

changes to suggest Osteomylelitis,[3] but that a chronic infectious process could not be ruled out.

---

[2]An Electromyogram (EMG) measures the electrical activity of muscles at rest and during contraction.  Nerve conduction studies measure how well and how fast the nerves can send electrical signals.  *EMG and Nerve Conduction Studies*, Web MD (2014), http://www.webmd.com/brain/electromyogram-emg-nerve-conduction-studies (Last visited September 23, 2014).

[3]Osteomyelitis is an infection of the bone.  *Osteomyelitis*, Web MD (2012), http://www.webmd.com/pain-management/osteomyelitis-treatment-diagnosis-symptoms (Last visited September 23, 2014).

On June 1, 2012, blood work reflected an elevated D-dimer level.[4]  The laboratory report noted that elevated levels of D-dimer are indicative of ongoing fibrinolysis and can be seen in various conditions including Deep Vein Thrombosis ("DVT")[5] and Pulmonary Embolism ("PE").[6]

On Friday, June 8, 2012, correctional officials transported the plaintiff to UCONN for his examination by a neurologist related to his shoulder pain.  A physician's assistant working in the neurology department examined the plaintiff and reviewed the MRIs of the plaintiff's cervical spine and right shoulder and noted that they showed posttraumatic deformity of the humeral head and neck, rotator cuff tear, severe osteoarthritis in the joint where the clavicle and scapula meet and stenosis[7] at the C5-C6 and C6-C7 vertebrae.  The physician's assistant indicated that the MRIs would be reviewed by another physician and that in her opinion the plaintiff would likely need a one or two level anterior cervical discectomy and fusion.  On June 11, 2012, the

---

[4]A D-dimer test is a blood test that measures a substance that is released when a blood clot breaks up.  Doctors order the D-dimer test to determine whether a patient has a dangerous blood-clotting problem, such as Deep Vein Thrombosis or Pulmonary Embolism.  D-Dimer Test, WEB MD (2013), http://www.webmd.com/dvt/d-dimer-test (Last visited September 23, 2014).

[5]DVT or Deep Vein Thrombosis is caused by a blood clot in a deep vein inside a muscle.  Symptoms may include swelling, pain, and tenderness, often in the legs.  "Deep Vein Thrombosis, WEB MD (2014), http://www.webmd.com/dvt/deep-vein-thrombosis-causes-are-you-at-risk-for-dvt (Last visited September 23, 2014).

[6]PE or Pulmonary Embolism is the sudden blockage of a major blood vessel (artery) in the lung, usually by a blood clot.  Most common symptoms are shortness of breath, sharp chest pain that is worse when taking a deep breath and a cough that brings up a pink, foamy mucus. *Pulmonary Embolism*, WEB MD (2014) http://www.webmd.com/lung/tc/pulmonary-embolism-topic-overview (Last visited September 23, 2014).

[7]Cervical Spinal Stenosis is the narrowing of the spinal canal in the neck.  The spinal canal is the open area in the bones (vertebrae) that make up the spinal column.  Cervical Spinal Stenosis, WEB MD (2014) http://www.webmd.com/back-pain/tc/cervical-spinal-stenosis (Last visited September 23, 2014).

physician's assistant noted that a neurologist had reviewed the MRIs and concluded that the

stenosis was mild and was not likely to be causing the plaintiff's shoulder pain and immobility.

The neurologist did not recommend surgery.

The plaintiff arrived back at MacDougall-Walker at 8:00 p.m. on June 8, 2012.  A nurse

examined him and noted that his left leg was swollen, but he was able to bear full weight on the

leg and had no ambulatory difficulties.  The nurse placed him on the list to see a physician on

Sunday, June 10th.  On Monday, June 11, 2012, Dr. Naqvi examined the plaintiff and noted that

his left leg was swollen, but was not tender.  The plaintiff did not complain of any pain

associated with the swelling.  The plaintiff reported that in 1997, a filter had been implanted in

his inferior vena cava, the large vein that carries blood from the feet, legs, pelvis and abdomen

back to the heart, due to injuries he had suffered during a motor vehicle accident.  Dr. Naqvi

noted that the plaintiff's D-dimer level was elevated. He ordered a re-fill of the plaintiff's

Aspirin prescription and another blood test to re-check the plaintiff's D-dimer level.  He directed

the plaintiff to return to the medical department on Wednesday, June 13, 2012.  Blood testing

performed on June 13, 2012, reflected a more elevated D-dimer level.

On June 15, 2012, Physician's Assistant Kevin McCrystal, examined the plaintiff's left

calf due to his complaints of pain and swelling over a two-week period.  The plaintiff related that

he had a history of DVT and PE and that he had a vascular filter in his inferior vena cava to

prevent blood clots from reaching his heart and lungs.  Physician's Assistant McCrystal

concluded that the plaintiff needed to be transported to UCONN for further evaluation and

treatment due to his symptoms, which included increased swelling and pain in his lower left leg,

elevated D-dimer levels on two prior occasions and a positive response to a physical examination

that was indicative of DVT.

Correctional officials transported the plaintiff to UCONN, where he underwent an ultrasound of his left calf.   The examination revealed that the plaintiff suffered from DVT.   A physician at UCONN prescribed two blood thinners, Lovenox and Warfarin, to treat the DVT and discharged the plaintiff back to MacDougall-Walker later that same day.   Upon his return to MacDougall that evening, a nurse noted the plaintiff's DVT diagnosis, spoke to the on-call physician and placed orders for the two medications that the plaintiff had been prescribed to treat his DVT.

On June 17, 2012, Dr. Naqvi examined the plaintiff, noted his left leg swelling, issued an order to continue the prescriptions for the two blood thinners, Lovenox and Coumadin,[8] until the plaintiff's International Normalized Ration ("INR") was greater than two.   At that point, he would discontinue the Lovenox, but maintain the Coumadin prescription.  He directed the plaintiff to return the medical department in a week for an examination.

On June 25, 2012, a nurse examined the plaintiff due to the plaintiff's complaints of left lower leg pain and swelling.  She noted his recent diagnosis of DVT, the fact that his lower left calf was two centimeters bigger than the right calf, and that it felt tight and painful.  The nurse spoke to the on-call physician who directed her to have the in-house physician examine the plaintiff the following morning.  The nurse informed the plaintiff that he would be examined by a physician in the morning, but that he should contact the medical department if his pain or

---

[8]Coumadin is a brand name of Warfarin. *Coumadin*, WEB MD (2014) http://www.webmd.com/heart-disease/guide/warfarin-other-blood-thinners (Last visited September 23, 2014).

swelling worsened before then.

Shortly before 10:00 p.m., a nurse examined the plaintiff due to his complaints of chest pain and difficulty taking deep breaths.  The nurse contacted the on-call physician, Dr. Pillai, who directed her to send the plaintiff via ambulance to UCONN for evaluation and treatment.

At UCONN, the emergency room physician ordered the plaintiff to undergo a CT scan[9] of his chest, blood work and an Electrocardiogram ("ECG") of his heart.   The ECG showed a normal sinus rhythm of the plaintiff's heart.  The CT scan showed that the plaintiff's heart size was within normal limits, there was a small pleural effusion[10] in the left lobe of the plaintiff's lungs, but no evidence of PE or pericardial effusion.[11]  A physician discharged the plaintiff back to MacDougall-Walker on June 26, 2012 with instructions to continue the Lovenox and Coumadin prescriptions.  The physician noted that any pain medication could be prescribed by the physician treating the plaintiff at MacDougall-Walker.  The diagnosis on discharge was unspecified chest pain.

During the morning of June 27, 2012, the plaintiff complained of chest pain and difficulty breathing.  A nurse examined him in the medical unit and noted that he did not appear

---

[9]A Computed Tomography (CT) scan uses x-rays to make detailed pictures of structures inside of the body. Each rotation of the CT scanner provides pictures of a thin slice of the organ or area being studied. *Computed Tomography*, WEB MD (2013) http://www.webmd.com/a-to-z-guides/computed-tomography-ct-scan-of-the-body(Last visited September 23, 2014).

[10]A Pleural Effusion is an abnormal amount of fluid around the lung. *Pleural Effusion*, WEB MD (2012) http://www.webmd.com/lung/pleural-effusion-symptoms-causes-treatments (Last visited September 23, 2014).

[11]A Pericardial Effusion is an abnormal amount of fluid between the heart and the Pericardium, which is the sack surrounding the heart. *Pericardial Effusion*, WEB MD (2013) http://www.webmd.com/heart-disease/guide/pericardial-effusion (Last visited September 23, 2014).

to be in respiratory distress.  She questioned whether the plaintiff was suffering from anxiety and noted that the physician would examine him later that morning.  Dr. Naqvi examined the plaintiff and prescribed several medications including an antibiotic, Toradol, Motrin and Tylenol #3, and that he undergo blood tests, including the D-dimer test.  He directed the plaintiff to return to the medical department on July 1, 2012.

On June 29, 2012, the plaintiff complained of stomach pain, constipation, weakness and difficulty walking.  Dr. Pillai prescribed several laxatives to treat the plaintiff's constipation.  A nurse provided the plaintiff with the laxative Milk of Magnesia and directed the plaintiff to contact the medical department if his symptoms became worse.

In the early morning hours of June 30, 2012, the plaintiff complained of constipation, nausea, an inability to keep food down, weakness and dizziness.  A nurse contacted Dr. Pillai who directed her to admit the plaintiff to the medical infirmary for observation and placed the plaintiff on a clear liquid diet.  He also prescribed a medication to treat the plaintiff's nausea.

Later that morning, the plaintiff complained again of constipation, nausea and an inability to keep foods down.  A nurse provided the plaintiff with the medications that had been prescribed by Dr. Pillai to treat constipation.  That afternoon, the plaintiff complained of stomach pain and nausea.  The nurse spoke with Dr. Carson Wright who prescribed medication to treat the plaintiff's nausea and an enema to treat the plaintiff's constipation.  The enema was minimally effective.

At 12:25 a.m. on July 1, 2012, a nurse contacted the on-call physician, Dr. Carson Wright, to inform him of the plaintiff's complaints of increased abdominal pain, nausea, constipation and inability to lay flat.  Dr. Wright ordered the medical staff to send the plaintiff to

UCONN for treatment.

At UCONN, the plaintiff underwent a CT scan and Angiogram[12] which revealed a large pericardial effusion.  A cardiologist performed a Pericardiocentesis[13] to remove fluid from around the plaintiff's heart.   The plaintiff showed immediate improvement after the procedure.  The plaintiff remained at UCONN in the cardiac stepdown unit for twenty-three days until there was no further evidence of significant pericardial effusion.  On July 23, 2012, a physician discharged the plaintiff back to MacDougall-Walker.

On August 2, 2012, a cardiologist at UCONN examined the plaintiff.  The plaintiff reported that he felt good, had resumed physical exercise and had no shortness of breath or pain on exertion.  The cardiologist noted that no specific cause of the pericardial disease had been uncovered after an extensive investigation.

## III.   **Discussion**

Defendants Pillai, Joanie and Dion assert one ground in support of their motion for summary judgment.  They argue that they were not deliberately indifferent to the plaintiff's medical conditions.

---

[12]A Computed Tomography Angiogram is a test that uses x-rays to provide detailed pictures of the heart and blood vessels that lead to the heart and other organs.  During the procedure, a special dye (contrast material) is injected into the area being examined to highlight the blood vessels as it moves through them.  *Computed Tomography Angiogram*, WEB MD (2012) http://www.webmd.com/a-to-z-guides/computed-tomography-ct-angiogram (Last visited September 23, 2014).

[13]Pericardiocentesis is a procedure in which a needle and catheter remove fluid from the sac around the heart.  A Pericardiocentesis is performed on an emergency basis to treat a condition called Cardiac Tamponade, a life-threatening, rapid buildup of fluid around the heart that weakens its ability to pump blood.  The procedure relieves pressure on the heart. *Pericardiocentesis*, WEB MD (2014) http://www.webmd.com/heart-disease/guide/pericardiocentesis (Last visited September 23, 2014).

A.      **Eighth Amendment Claims**

Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  To prevail on a claim of deliberate indifference to medical needs under the Eighth Amendment, a plaintiff must provide evidence of sufficiently harmful acts or omissions and intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel.  *See id.* at 104-06.  Mere negligence will not support a section 1983 claim.  See *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) ("Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law").  Furthermore, mere disagreement with prison officials about what constitutes appropriate care does not state a claim cognizable under the Eighth Amendment.  "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."  *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

There are both subjective and objective components to the deliberate indifference standard.  *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir 1994), *cert. denied sub nom. Foote v. Hathaway*, 513 U.S. 1154 (1995).  Objectively, the alleged deprivation must be "sufficiently serious."  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  The condition must produce death, degeneration or extreme pain.  *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  The Second Circuit has identified several factors that are highly relevant to the inquiry into the seriousness of a medical condition:  "'[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical

11

condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" *Chance*, 143 F.3d at 702 (citation omitted).

Subjectively, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his actions or inactions. *See Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006). Thus, the fact that a prison official did not alleviate a significant risk that he should have but did not perceive does not constitute deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 838 (1994).

Defendants Pillai, Joannie and Dion do not address the objective prong of the Eighth Amendment standard and do not contest the fact that the plaintiff's medical conditions during the time period in question were serious. Instead, they argue that they were not deliberately indifferent to those serious medical needs. The plaintiff contends that the defendants failed to provide him with even a minimal level of medical care.

The plaintiff asserts that blood test results dated June 1 and 13, 2012, indicated elevated D-dimer levels which were indicative of DVT. He claims that no effort was made by medical personnel to determine if he might be suffering from one of the conditions suggested by the elevated D-dimer levels. The plaintiff generally avers that during the early part of June 2012, he experienced severe swelling and pain in his left leg and was told by unidentified individuals that these symptoms indicated he was suffering from Cellulitis[14] and was given a prescription for Motrin. The plaintiff's medical records do not reflect that the plaintiff made any complaints or sought treatment from medical personnel during the period from May 28, 2012 to June 7, 2012.

_____

[14]Cellulitis is a bacterial infection of the deepest layers of the skin. *Cellulitis*, WEB MD (2013) http://www.webmd.com/skin-problems-and-treatments/tc/cellulitis-topic-overview (Last visited September 23, 2014).

*See* Defs.' Local Rule 56(a)1 Statement, Ex. B.

On June 8, 2012, a nurse noted the plaintiff's complaints of left leg pain and swelling and referred him to see a physician.  Dr. Naqvi examined the plaintiff on June 11, 2012 and noted that the leg was swollen, but not tender.  He ordered repeat blood work to assess the plaintiff's D-dimer level.  *See id.*

On June 15, 2012, in view of the plaintiff's medical history, his complaints of pain and swelling in his left leg and test results indicating an elevated D-dimer level, Physician's Assistant McCrystal sent the plaintiff to UCONN for treatment.  *See id.*  An ultrasound revealed that the plaintiff suffered from DVT in his left, lower leg.  *See* Defs.' Local Rule 56(a)1 Statement, Ex. A.  Physicians at UCONN prescribed medication to treat this condition and discharged him back to MacDougall-Walker.  *See id.*

The plaintiff claims that he experienced pain in his chest and difficulty breathing upon his return to MacDougall-Walker on June 15, 2012, and complained repeatedly about these symptoms from June 15, 2012 to June 25, 2012, but the defendants ignored his complaints. There are no notations in his medical file to support the complaints allegedly made by the plaintiff to medical personnel during this time period.  Nor has the plaintiff submitted any Inmate Requests, letters or Grievances that he filed at the time that included allegations about his symptoms of chest pain and difficulty breathing.

On June 25, 2012, in response to the plaintiff's complaints of chest pain and respiratory difficulties, medical personnel at MacDougall-Walker transferred the plaintiff to UCONN for evaluation and treatment.  *See* Defs.' Local Rule 56(a)1 Statement, Ex. B.  A CT scan performed on June 25, 2012 at UCONN, showed no evidence of a PE or Pericardial Effusion.  *See* Defs.'

Local Rule 56(a)1 Statement, Ex. A.   Although, the plaintiff claims that physicians at UCONN diagnosed him as suffering from a bacterial infection and prescribed an antibiotic to treat it, the treating physician's diagnosis on discharge was unidentified chest pain.  *See id.*  There is no indication that any physician at UCONN diagnosed the plaintiff as suffering from a bacterial infection in the plaintiff's chest or that a physician prescribed an antibiotic to treat any infection.

After his return to MacDougall-Walker on June 26, 2012, the plaintiff asserts that defendants Pillai, Joanie and Dion repeatedly ignored his symptoms and complaints of pain and difficulty breathing and subjected him to painful enemas and psychological torture.  He claims that the defendants failed to diagnose his condition as heart failure despite the fact that the symptoms were obvious and they allowed his condition to deteriorate to the point where he had to be rushed to the hospital in the early morning hours of July 1, 2012, for emergency heart surgery.

The plaintiff's medical records reflect that when he returned to MacDougall-Walker on June 26, 2012, he had not been diagnosed with Pericarditis, a PE or a bacterial infection.  In fact, the CT scan performed by physicians at UCONN revealed no evidence of a PE or Pericardial Effusion and the silhouette of the plaintiff's heart was normal.  *See id.*  During his stay at UCONN, physicians treated him with pain medication and anti-nausea medication, but did not discharge him on these medications.  The physicians at UCONN discussed the results of the CT scan with the plaintiff's treating physicians at MacDougall-Walker and recommended that the plaintiff continue to take the two blood thinner medications until his INR was greater than two. *See id.*

The plaintiff's medical records reveal that upon his return to MacDougall-Walker,

medical personnel continued to provide the plaintiff with blood thinner medications and treated the plaintiff for his symptoms which included difficulty breathing, nausea, vomiting, stomach/chest pain and constipation.   Drs. Pillai and Wright prescribed medications to treat the plaintiff's nausea and constipation and Dr. Naqvi prescribed medication to treat the plaintiff's complaints of pain and ordered blood tests, including the D-dimer test.   *See* Defs.' Local Rule 56(a)1 Statement, Ex. B.

A nurse contacted the on-call physician, Dr. Pillai, in the early morning hours of June 30, 2012, due the plaintiff's complaints of nausea, vomiting, weakness and dizziness.  Dr. Pillai admitted the plaintiff to the medical infirmary for observation and prescribed a medication to treat the plaintiff's nausea.  *See id.*  Due to the plaintiff's complaints of increased abdominal pain, nausea and constipation and her observations of the plaintiff's distended and tender abdomen and inability to lie flat, a nurse contacted Dr. Wright just after midnight on June 30, 2012.  Dr. Wright issued an order that the plaintiff be transported immediately to UCONN for treatment.  *See id.*  After correctional officials transferred the plaintiff to UCONN in the early morning hours of July 1, 2012, the plaintiff underwent a  Pericardiocentesis to remove the fluid from around his heart.  The plaintiff showed immediate improvement after the procedure.  *See* Defs.' Local Rule 56(a)1 Statement, Ex. A.

Although the cardiologists at UCONN suspected that the plaintiff's pericardial effusion was due to viral Pericarditis, the cardiologist who examined him in August 2012, noted that an extensive search for the etiology of the Pericarditis was non-revealing.  *See id.*  Although the nurses and physicians at MacDougall-Walker may not have correctly interpreted the plaintiff's symptoms as indicative of a problem with his heart, they were not indifferent to the symptoms.

15

*See Farmer*, 511 U.S. at 838 ("an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation," does not constitute deliberate indifference); *Estelle*, 429 U.S. at 106 ("a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a clam of medical mistreatment under the Eighth Amendment").  They treated the plaintiff based on their evaluation of his symptoms and medical history, including the fact that the plaintiff had just returned from UCONN after diagnostic tests and scans revealed no evidence of a PE or Pericardial Effusion and the fact that the physicians at UCONN had recommended that the plaintiff continue to take the blood thinner medications.

The plaintiff's medical records reflect that MacDougall-Walker physicians, including Dr. Pillai, prescribed medications to treat the plaintiff's symptoms, ordered blood work, monitored his INR level and dosages of blood thinning medications, placed the plaintiff in the medical infirmary to better observe his condition and issued an order to have the plaintiff transferred to UCONN for further evaluation and treatment.  The records also reflect that the nurses who treated the plaintiff provided him with the prescribed medications, reported the plaintiff's symptoms to the on-call physicians when necessary and arranged for the plaintiff's transport to UCONN for further evaluation and treatment.  *See* Defs.' Local Rule 56(a)1 Statement, Ex. B. Based on the medical evidence, no reasonable jury could find that the defendants were deliberately indifferent to the plaintiff's symptoms during the month of June 2012.

In addition, there is no evidence that medical personnel at MacDougall-Walker, including Dr. Pillai, neglected to monitor the plaintiff's medical conditions after he returned to MacDougall-Walker at the end of July 2012.  On August 2, 2012, a cardiologist examined the

plaintiff and noted that the plaintiff felt well and had no symptoms of Pericarditis.  She recommended that the plaintiff's treating physician at MacDougall Walker discontinue an anti-inflammatory medication that had been prescribed to treat the plaintiff's Pericardial symptoms while he was at confined at UCONN in July and to taper the plaintiff off of the steroid medication that had also been prescribed to treat the plaintiff's symptoms.  The plaintiff's medical records reflect that Dr. Naqvi and Dr. Pillai  tapered the plaintiff off of the steroid medication and subsequently discontinued the other anti-inflammatory medication in accordance with the cardiologist's orders.  During the months of August through October 2012, Dr. Pillai monitored the plaintiff's INR level and adjusted the plaintiff's blood thinner medications accordingly.

On July 24, 2012, Dr. Naqvi submitted a request to the URC on the plaintiff's behalf seeking a consultation with an orthopedist at UCONN regarding the plaintiff's shoulder pain and immobility.  The URC denied this request.  In October 2012, Dr. Naqvi treated the plaintiff for his complaints that the blood thinner medication was causing him to feel lethargic.  A chest x-ray taken at that time reflected no active cardiopulmonary process and no suggestion of Percardial Effusion.  *See id.*

The plaintiff has failed to submit any evidence to suggest that Dr. Pillai or Nurses Joanie or Dion were deliberately indifferent to his medical needs at any time after his discharge from UCONN at the end of July through the date the plaintiff signed his Complaint in December 2012.  Accordingly, the motion for summary judgment is granted with respect to all of the Eighth Amendment claims for deliberate indifference to medical needs against defendants Pillai, Joanie and Dion in their individual and official capacities.

B.      **First Amendment Claims**

In addition to the claims that the defendants violated the plaintiff's Eighth Amendment rights, the Complaint includes allegations that medical staff at MacDougall-Walker violated his First Amendment rights.  The plaintiff asserts that his First Amendment right to freedom of speech was violated because doctors and medical staff refused to respond to his Inmate Requests and Grievances seeking treatment for his medical conditions.

It is well established ... that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim." *Swift v. Tweddell*, 582 F. Supp. 2d 437, 445-46 (W.D.N.Y. 2008) (collecting cases).  Thus, the alleged failure of any of the defendants to respond to or process the plaintiff's Inmate Requests or Grievances relating to medical treatment did not violate any constitutionally or federally protected rights of the plaintiff.  *See Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003) ("Although state laws may in certain circumstances create a constitutionally protected entitlement to substantive liberty interests, state statutes do not create federally protected due process entitlements to specific state-mandated procedures."); *Pocevic v. Tung*, No. 3:04CV1067 (CFD), 2006 WL 680459, at *8 (D. Conn. Mar. 14, 2006) ("court can discern no federally or constitutionally protected right that was violated by defendant['s] failure to comply with the institutional procedures regarding the timing of his response to [plaintiff's] level 2 grievance").  Accordingly, the plaintiff's claims against the defendants regarding their alleged lack of response to his Grievances and Inmate Requests are dismissed.  *See* 28 U.S.C. § 1915(e)(2)(B)(ii) (allowing the district court to dismiss at any time allegations that fail to state a

cognizable claim).     The plaintiff also asserts that when he returned from UCONN at the end of

July 2012, he informed an unidentified individual at MacDougall-Walker that he was upset about

what had happened to him and thought the medical department and doctors had engaged in

illegal conduct in response to his requests for treatment.  The plaintiff suggests that the grievance

coordinator and physicians refused to answer any of his grievances seeking medical care after he

made this statement.

 To the extent that the plaintiff is attempting to assert a retaliation claim, the facts do not

support such a claim.  To state a retaliation claim, the plaintiff must show that his conduct was

protected by the Constitution or federal law and that this protected conduct was a "substantial or

motivating factor" in the alleged retaliatory action by prison officials.  *Bennett v. Goord*, 343

F.3d 133, 137 (2d Cir. 2003).  Because claims of retaliation are easily fabricated, the courts

consider such claims with skepticism and require that they be supported by specific facts;

conclusory statements are not sufficient.  *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.

2003).

 The plaintiff's Complaint is dated December 7, 2012, and was received by the Clerk for

filing on February 21, 2013.  There are no grievances or other exhibits attached to the Complaint

or the plaintiff's memorandum in response to the motion for summary judgment.

 Included in the plaintiff's medical records is an Inmate Grievance dated November 22,

2012.  A registered nurse responded to the grievance on November 27, 2012.  The nurse noted

that the plaintiff had been seen on numerous occasions by nurses and physicians at MacDougall-

Walker and also by nurses and physicians at UCONN for his medical needs.  She directed the

plaintiff to utilize sick call procedures at MacDougall-Walker if he experienced further medical

19

problems. *See id.* The plaintiff's medical records reflect that he did in fact seek medical treatment for various conditions from January 2013 to July 2013, when he was transferred to Osborn.

The plaintiff has not submitted any other Grievances, letters or Inmate Requests that he sent to medical staff or the grievance coordinator at MacDougall-Walker during the period from July 24, 2012 to December 2012, when he signed his Complaint. In fact, the nurse who responded to the plaintiff's November 2012 Grievance noted that there was no record of any prior grievances having been filed by the plaintiff pertaining to his medical treatment. Thus, there is no evidence that the grievance coordinator or medical personnel refused to reply to the plaintiff's requests for or complaints about medical treatment. The plaintiff has failed to allege facts to support a claim of retaliation in violation of his First Amendment rights. The First Amendment claims are dismissed for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

IV.     **Conclusion**

The Motion for Summary Judgment [**Doc. No. 19**] is **GRANTED** with respect to all Eighth Amendment claims for deliberate indifference to medical needs against defendants Pillai, Joannie and Dion in their individual and official capacities. The First Amendment claims are **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). Because the court has granted summary judgment on the Eighth Amendment claims and dismissed the First Amendment claims, it declines to exercise supplemental jurisdiction over any state law claims. *See* 28 U.S.C. 1367(c)(3) (district court may decline to exercise supplemental jurisdiction if it has dismissed all

federal claims); *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001) (collecting

cases).  The Clerk is directed to enter judgment for the defendants and close this case.

      **SO ORDERED** this 12th day of January 2015, at Bridgeport,

Connecticut.

            /s/ STEFAN R. UNDERHILL
            Stefan R. Underhill
            United States District Judge